**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 19 2013, 8:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**EUGENE C. HOLLANDER**
Special Assistant to the Office
of the State Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHELLE BUMGARNER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEREMY L. MUSALL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 61A01-1208-CR-371 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PARKE CIRCUIT COURT
The Honorable Samuel A. Swaim, Judge
Cause No. 61C01-1108-MR-217

**March 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

Appellant-Defendant Jeremy Musall went to the home shared by his ex-girlfriend Tanya Yeagley, her new boyfriend Joe Snow, and Yeagley's and Snow's child J.S. As Yeagley and J.S. watched, Musall tortured Snow by beating him severely, strangling him, stabbing him, and even extinguishing a lit cigarette on his eyeball. Musall then proceeded to rape Yeagley. At some point, Snow died from his injuries, which included a skull fracture, crushed windpipe, and broken ribs. When Musall discovered that Snow had died, he put the body into the trunk of a car with the intention of dumping it in a remote location. Musall took J.S. with him, ordered Yeagley to follow in another vehicle, and told Yeagley that he would kill J.S. if she did not. Yeagley was able to contact authorities with Snow's mobile telephone, and Musall was eventually apprehended.

The State charged Musall with murder, felony murder, two counts of Class A felony burglary, Class A felony rape, and Class A felony kidnapping. After a jury found Musall guilty as charged, the trial court sentenced him to an aggregate term of 165 years of incarceration. Musall contends that, in light of the nature of his offenses and his character, his sentence is inappropriately harsh. We think not, and therefore affirm.

## FACTS AND PROCEDURAL HISTORY

Yeagley began dating Snow "off and on" in 2008, and the couple had a daughter together, J.S. Tr. p. 231. In 2011, Yeagley had a three-month romantic relationship with Musall, which ended in August. By August 12, 2011, Yeagley and Snow were "on" again, and J.S. was now twenty months old. Musall apparently became suspicious that Yeagley might be back with Snow, a fact Yeagley wanted to conceal from him. That evening, Musall

2

came to the Parke County home Yeagley, Snow, and J.S. shared, asking "Where the f*** is Joe?" Tr. p. 237. Snow hid in a closet, and Musall left after a few minutes. Although Snow and Yeagley made plans to go to her mother's home, they did not and, instead, went to sleep.

At some point, Yeagley was awakened by a loud noise and saw Snow beside her, unconscious and bleeding from his mouth. Musall removed his shirt, saying, "I'm gonna take this shirt off. I don't want to get blood on it." Tr. p. 241. Musall yelled "Where the f*** is your phone. I want your phones[,]" and although he soon found Yeagley's telephone, Snow's telephone could not be located. Tr. p. 243. Meanwhile, J.S. was also awake and was screaming, and Snow had regained consciousness.

Stumbling, Snow attempted to escape the bedroom, but Musall followed, saying "Where the f*** do you think you're going? You think I wouldn't f****** find you?" Tr. p. 241. Musall caught Snow in the kitchen, punched Snow several times, and strangled him, saying "You're gonna f****** die tonight." Tr. p. 241-42. Musall returned to the bedroom, said to Yeagley, "F****** whore. I knew you were lying[,]" dragged her around by her hair, shoved her into a shelf, and punched her in the back of head several times. Tr. p. 244. Musall ordered Yeagley to the living room, where he made her sit on the floor in front of the entertainment center.

Musall dragged the again unconscious Snow into the living room, where he straddled him, slapped and punched his face repeatedly, and said, "You're all gonna f****** die tonight." Tr. p. 245. At one point, when Snow fell over onto a pillow, Musall said, "Quit bleeding on my girls' pillow you f****** b****[,]" which prompted Yeagley to scream. Tr.

3

p. 246. Musall came over to Yeagley and punched her three times, saying "I knew you were a conniving whore. This is all your fault. You're a f****** whore. Now you're gonna die tonight." Tr. p. 246.

Musall lit a cigarette and drank a beer, telling Yeagley that he would have to kill everyone because you cannot have living witnesses. After Musall extinguished his cigarette on Snow's eyeball, he beat Snow with a vacuum cleaner until it broke. Musall then retrieved a knife from the kitchen and began stabbing Snow with it, saying, "How does that feel f*****? How does that f****** feel?" Tr. p. 248. Musall bound Snow with duct tape and the vacuum cleaner power cord. When J.S. again began screaming and crying, Musall told her to "shut the f*** up" and put her on the couch. Tr. p. 248. Musall then told Yeagley to take a shower and, while brandishing the knife, said, "If you don't I'm gonna cut [J.S.]'s neck off right here with this." Tr. p. 249.

When Yeagley and Musall finished showering, Musall said, "You're gonna help me cover up your own murder. You're gonna wash my clothes." Tr. p. 250. When Yeagley attempted to dress, Musall said, "I don't f****** think so. I'm gonna f*** you in the a**." Tr. p. 251. Musall and Yeagley had vaginal intercourse, and Musall attempted anal intercourse on Yeagley, performed cunnilingus on her, and made her fellate him. Musall took several pictures of the sexual activity on his mobile telephone. When Musall attempted to penetrate Yeagley anally a second time, she protested, and he said, "Shut the f*** up, b****, I will do whatever I want." Tr. p. 252.

4

Eventually, Yeagley received a call from work, as she had failed to report at 6:00 a.m. as scheduled. Musall told Yeagley to call back and tell her employer that she would not be in that day, and as she tried to call she heard Musall shout, "Joe's dead." Tr. p. 253. Musall removed the duct tape and power cord from Snow's corpse and wrapped it in a quilt. Musall told Yeagley that he was going to dispose of Snow's body and that she needed to come as well. Musall planned to take J.S. with him in his vehicle with Yeagley following in hers. Musall told Yeagley that "if [she] didn't stay on his a** he would kill [J.S.] and [she] would never see her again[.]" Tr. p. 254. After Snow's body was loaded, Yeagley asked if she could return and retrieve J.S.'s diaper bag from her home. When Yeagley returned for the diaper bag, she spotted Snow's mobile telephone under a bed and concealed it in her underwear. As the two drove, Yeagley managed to place a call to 911. Police soon arrived, but Musall evaded them long enough to leave Snow's body in a cornfield. At some point, the vehicle driven by Musall sustained damage in a collision. Authorities eventually found Musall and J.S. at his grandmother's house in Cloverdale, with J.S. apparently physically unharmed.

The causes of Snow's death were blunt force trauma to the head and manual and ligature strangulation. Snow had suffered at least twenty different head and brain injuries, including a skull fracture, brain laceration, and multiple incisions to his face. Snow's neck showed evidence of both manual and ligature strangulation, and his windpipe showed evidence of being crushed from the outside. In addition, Snow suffered blunt force injuries to his torso and extremities, fractured ribs, and several injuries that could have been knife

5

cuts, and there was evidence that Snow had been stomped on the chest. Yeagley suffered multiple bruises and abrasions on her scalp, face, and ears; swelling, redness, and discoloration to her throat; and multiple bruises to her arms, legs, and back.

On August 17, 2011, the State charged Musall with Count I, murder; Count II, felony murder; Count III, Class A felony burglary causing bodily injury to Snow; Count IV, Class A felony burglary causing bodily injury to Yeagley; Count V, Class A felony rape of Yeagley compelled by force or threat of force; and Count VI, Class A felony kidnapping of J.S. with the intent to use her as a human shield or hostage. On July 16, 2012, a jury found Musall guilty as charged. On August 9, 2012, the trial court merged the conviction for Count II into Count I and reduced the Count III conviction to a Class B felony. The trial court sentenced Musall to sixty-five years of incarceration for Count I, twenty years for Count III, fifty years for Count IV, fifty years for Count V, and fifty years for Count VI. The trial court ordered that the sentences for Counts I and III be served concurrently, the sentences for Counts IV and V be served concurrently, and that those sentences be served consecutive to one another and to the sentence for Count VI, for an aggregate sentence of 165 years of incarceration.

With respect to Count I, the trial court found the following aggravating circumstances: the harm to Snow was much greater than necessary to commit murder, Musall's criminal record, and the crime was committed in the presence of J.S. With respect to counts IV and V, the trial court found the following aggravating circumstances: the harm to Yeagley was much greater than necessary to commit Class A felony burglary or Class A felony rape, Musall's criminal record, and the crime was committed in the presence of J.S. With respect

6

to Count VI, the trial court found, as an aggravating circumstance, that the harm to J.S. was far greater than necessary to commit Class A felony kidnapping.

## DISCUSSION AND DECISION

### Whether Musall's Sentence Is Inappropriate

We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied* (citations and quotation marks omitted). "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). In addition to the "due consideration" we are required to give to the trial court's sentencing decision, "we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). As previously mentioned, the trial court sentenced Musall to an aggregate 165 years of incarceration.

Musall's offenses are among the worst we have seen. It was not enough for the jealous Musall to simply kill Snow. Instead, Musall brutally and sadistically tortured Snow

7

to death.  Musall severely beat Snow with his fists and a vacuum cleaner, stomped him, stabbed him, choked and strangled him, bound him with duct tape, and put out a lit cigarette on his bare eyeball.  There was never any doubt of Musall's intent, as he said repeatedly that Snow was going to die that night.  As if this were not bad enough, Musall committed these atrocities in front of Snow's child and the mother of that child.  J.S. watched as her father was brutally murdered and, indeed, became covered in his blood, and Yeagley watched as her boyfriend and the father of her child was murdered.  It is difficult to imagine a more heinous murder.

While Snow lay dying, or perhaps already dead, Musall turned to raping Yeagley, all while she was helping to cover up her own murder, as Musall put it.  Musall, who gave Yeagley every reason to believe that she and J.S. themselves would soon be killed, penetrated her vaginally and attempted to do so anally.  Musall forced Yeagley to fellate him and forced cunnilingus on her.  Very likely J.S. witnessed, or at least was aware of, her mother's rape.  Yeagley had to endure the additional humiliation of knowing that the entire episode was being documented by Musall on his mobile telephone.  After being made to watch the torture and murder of Snow, Yeagley was then violated in the most egregious fashion, all while being told that she and her daughter would soon be killed.  As with Snow's murder, it is difficult to image a more heinous rape.

Musall's treatment of J.S. is no less egregious.  As Musall was killing Snow, J.S. slipped and fell several times in her father's blood and cried herself to sleep at one point on a pillow soaked in his blood.  Having already tortured her father to death, raped her mother,

8

and threatened to "cut her neck off," Musall kidnapped J.S. to secure Yeagley's assistance in disposing of Snow's body. Musall again threatened to kill J.S., telling Yeagley that Yeagley would never see J.S. again if Yeagley did not follow him on his mission. We can only hope that J.S. was young enough that she does not remember the horrors to which Musall subjected her. In summary, the nature of Musall's offenses more than justifies enhanced and consecutive sentences.

Musall's character is no less appalling. Musall, twenty-seven years old at the time of the events described in this opinion, had already amassed an extensive criminal record, most of which is related to violence. On February 2, 2006, Musall pled guilty to Class B misdemeanor public intoxication, Class A misdemeanor battery resulting in bodily injury, and Class B misdemeanor disorderly conduct. On August 2, 2006, Musall pled guilty to Class A misdemeanor battery resulting in bodily injury, Class B misdemeanor disorderly conduct, and Class A misdemeanor resisting law enforcement, charges apparently arising out of two separate incidents. On June 6, 2007, Musall pled guilty to Class A misdemeanor domestic battery. On December 6, 2007, Musall pled guilty to Class A misdemeanor battery resulting in bodily injury and Class B misdemeanor public intoxication. On December 8, 2008, Musall pled guilty to Class C felony battery resulting in serious bodily injury. Musall has served several terms of incarceration, been found to have violated the terms of probation on five occasions, and been charged with fourteen additional crimes. Musall's criminal record clearly indicates a pattern of violence, escalating in severity and culminating in the events at issue in this appeal.

Musall's character is also revealed in statements made following Snow's murder. In a police interview conducted the morning of his arrest, Musall showed no remorse for what he had just done, referring to Snow as "a piece of s***" and a "wimp" and to himself as "a fighter." State's Ex. 3004. In a telephone call made from jail on August 20, 2011—eight days after Snow's murder—Musall can be heard joking with an unidentified female about Snow's death. As it happens, the car Musall was driving the morning he killed Snow belonged to Musall's sister's boyfriend. When the unidentified female caller told Musall that the owner of that vehicle would have to purchase a new one because of the damage it had sustained, Musall's response was, "How big's the trunk?" State's Ex. 851-A. When told that he should not make jokes like that on the telephone because his calls were likely being recorded, Musall replied, "They already know what I did." State's Ex. 851-A. Musall's character also justifies the imposition of enhanced and consecutive sentences.

Justifiably, Musall received a lengthy sentence, and that aggregate sentence needs to be evaluated in light of the number of victims. The Indiana Supreme Court has observed that "when the perpetrator commits the same offense against two victims, enhanced and consecutive sentences seem necessary to vindicate the fact that there were separate harms and separate acts against more than one person." *Serino v. State*, 798 N.E.2d 852, 857 (Ind. 2003). When one considers that Musall's crimes had three victims—one tortured to death, one beaten and raped, and the third used as a hostage—Musall's 165-year aggregate sentence does not strike us as at all inappropriate.

We affirm the judgment of the trial court.

10

NAJAM, J., and FRIEDLANDER, J., concur.